IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

ALBERT KEARNEY

Defendant.

Criminal No.:  ELH-18-17

**MEMORANDUM OPINION**

Albert Kearney, defendant, pled guilty in December 2018 to conspiracy to distribute heroin, for which he is serving a sentence of 132 months' imprisonment at Williamsburg FCI. ECF 260.  He has filed a pro se motion for compassionate release (ECF 840, the "Motion"), with two supporting exhibits.  The government's opposition is docketed at ECF 952, supported by three exhibits.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

### I.  Background

Kearney was indicted on January 11, 2018 (ECF 1), along with seventeen others.  A Superseding Indictment was filed on March 22, 2018, which added a nineteenth defendant.  ECF 157.  In particular, defendant was charged in Count One with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846.  *Id.* at 2. He was charged in Count Two with possession of a firearm by a prohibited person, under 18 U.S.C. § 922(g).  *Id.* at 3.  In Count Three, defendant was charged with possession with intent to distribute heroin, under 21 U. S. C. § 841(a).  *Id.* at 4.  Count Four charged Kearney with possession of a firearm in furtherance of a drug trafficking crime, pursuant to 18 U.S.C. § 924(c).  *Id.* at 5.

On December 10, 2018, defendant entered a plea of guilty to Count One of the Superseding Indictment (ECF 347), pursuant to a Plea Agreement. ECF 349. The Plea Agreement included a stipulation of facts. *Id.* at 9. According to this stipulation, between March 2017 and January 2018, Kearney participated in a conspiracy to obtain and distribute one kilogram or more of heroin. *Id.* The defendant was a member of the "'Good Pussy' heroin shop" ("GP heroin shop"), which operated around "the 5100 block of Fairlawn Avenue in Baltimore, Maryland," an area known as "the Buses." *Id.*

Pursuant to an authorized wiretap, the Drug Enforcement Administration intercepted wire and electronic communications between members of the GP heroin shop, including Kearney, discussing the conspiracy's operations. *Id.* Investigators also positioned a pole camera near the Buses and another at 4201 Penhurst Avenue, where the conspirators kept their supply of heroin. *Id.* Using these cameras, investigators captured video evidence of defendant, on numerous occasions, "going to the location of the GP heroin shop's stash location," before "driving directly to the Buses to supply heroin" to his co-conspirators. *Id.*

In March 2017, investigators executed a search warrant of defendant's residence. *Id.* They recovered 101 grams of heroin, a loaded firearm, and over $1,100. *Id.* After defendant was advised of his *Miranda* rights, he admitted that the property belonged to him. *Id.*

In the Plea Agreement, the parties contemplated a base offense level of 30, based on the drug quantity. *Id.* ¶ 6(a). The parties also agreed to a two-level increase because the defendant possessed a firearm. *Id.* There was no agreement as to defendant's criminal history. *Id.* ¶ 7. But, the Plea Agreement reflects the government's belief that defendant would qualify as a career offender, which would increase his base offense level to 37, before deductions for acceptance of responsibility. *Id.* ¶ 6(a).

The Presentence Investigation Report (ECF 408, the "PSR") reflected that the defendant, born in 1968 (*id.* at 3), has a long criminal history. *Id.* ¶¶ 28-45. This resulted in his designation as a career offender. *Id.* ¶ 47.

Several of the offenses listed in the PSR did not score points. *See id.* ¶¶ 28-38, 42, 43, 45. However, of pertinence here, defendant's record included two prior felony drug distribution convictions. *Id.* ¶¶ 39, 40. In December 2001 Kearney was convicted of distribution of a controlled dangerous substance as well as conspiracy. *Id.* ¶ 39. He received concurrent sentences of twenty years imprisonment, sixteen of which were suspended, as well as five years' probation. *Id.* Nearly six years later, in September 2007, defendant pled guilty to one count of distribution of narcotics, for which he was sentenced to ten years' incarceration, nine of which were suspended, and three years' probation. *Id.* ¶ 40.

Sentencing was held on February 22, 2019. ECF 435. At that time, Kearney was fifty years old. *See* ECF 408 at 3. Kearney had a final offense level of 34 and a criminal history category of VI. ECF 420 at 1. The Sentencing Guidelines ("U.S.S.G." or "Guidelines") called for a period of imprisonment ranging from 262 to 327 months. *Id.*[1]

Defendant reported a history of use of marijuana, alcohol, heroin, and crack cocaine, including daily use of all four substances for various periods of time. ECF 408, ¶ 84. And, he previously participated in substance abuse treatment programs, with little or no success. *Id.* ¶ 86. Nonetheless, Kearney indicated that he would be "amenable to participating in substance abuse treatment while in the Bureau of Prisons and as a condition of his supervision." *Id.*

---

[1] If defendant were not a career offender, his criminal history category would have been a IV. *Id.* ¶ 46. And, his final offense level would have been a 29. *See* ¶¶ 2-23. The Guidelines would have called for a sentence of imprisonment between 121 to 151 months.

The government recommended a sentence in the range of 120 to 180 months' incarceration. ECF 349 at 5.  I imposed a sentence of 132 months' imprisonment, with credit for time served, followed by five years of supervised release.  ECF 419 at 3.

Kearney is currently serving his sentence at Williamsburg FCI.[2]  ECF 840 at 2; ECF 952 at 15.  There is no indication that defendant has committed any disciplinary infractions while incarcerated.  Moreover, it is undisputed that he has successfully completed several educational programs during his term of imprisonment.  ECF 840-2 at 2.

Defendant submitted a request for compassionate release to the Warden on September 9, 2020.  ECF 840-2 at 7.  That request was promptly denied.  *Id.* at 8.  Defendant sought an administrative remedy, asking the Warden to conduct a review of defendant's medical history, pursuant to his request for compassionate release.  *Id.* at 6.  This request was also denied.  *Id.* at 6.

Defendant has a projected release date of June 14, 2028.  ECF 840 at 9; *see also Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited August 16, 2021). To date, he has served approximately 24% of his sentence.  If released, Kearney claims that he would enjoy the support of his sister, Cynthia Harrison, with whom he plans to live in Baltimore, as well as his mother, Christine Jones.  ECF 840 at 9; ECF 840-2 at 1.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v.*

---

[2] Defendant began his sentence in Fort Dix FCI.  He was transferred to Williamsburg FCI on July 30, 2020. ECF 952-3 at 151.

*United States*, 564 U.S. 522, 526 (2011).   One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility,"

whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I)  suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where

the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228,

230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283.   Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'"   *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo.

2019).

### III.  COVID-19[3]

The nation has been "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[4]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F.Supp.3d 242, 247 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F.Supp.3d 746, 752-753 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.

---

[3] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

The virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of August 16, 2021, COVID-19 has infected more than 36 million Americans and caused over 620,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed August 16, 2021).

The virus continues to afflict those residing in countries around the world. Although this country saw a reduction of cases for a period of time, the spread of the Delta variant has, in recent weeks, reversed this trend; COVID-19 cases are again surging.  *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months").  Furthermore, the Delta variant is thought to be more virulent and capable of causing more severe illness than earlier strains of COVID-19.  *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

As of August 16, 2021, COVID-19 has infected nearly 37 million Americans and caused approximately 620,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed August 16, 2021).  Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase

the chance of severe illness due to the virus.  Those risk factors initially included age (over 65);

lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease;

and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who*

*Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020),

https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, November 2, 2020, and March 29, 2021, the CDC revised

its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.

On August 20, 2021, to reflect the most recently available data, the CDC again revised its guidance.

*See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar.

29, 2021), https://bit.ly/38S4NfY (updated Aug. 20, 2021).  According to the CDC, the factors that

increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD,

asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension;

dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart

conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV;

being immunocompromised; liver disease; obesity, or body mass index ("BMI") of 25 or higher;

pregnancy; sickle cell disease or thalassemia; smoking; solid organ or blood stem cell transplant;

stroke or cerebrovascular disease; and substance use disorders.  *Id.*  The CDC has also indicated

that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.

*See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-*

*19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

To stem the spread of the virus, people were urged to practice "social distancing" and to

wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*,

CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9,

2020).  Social distancing is particularly difficult in the penal setting, however.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary

settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[5]

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *see Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of

The Department of Justice ("DOJ") recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 466 F.Supp.3d 587, 599 at *8 (E.D. N.C. 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 466 F.Supp.3d at 599. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons twelve years of age

---

the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

and older.  Approximately 59% of the eligible population, and 62% of all persons eighteen years of age and older, are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited August 17, 2021).  And, about 50% of the total U.S. population is fully vaccinated.  *See id.*[6]

Critically, the CDC has, in recent weeks, reaffirmed that "the vaccines authorized in the United States are highly effective at preventing severe disease and death, including against the Delta variant."  *Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html, *supra*.  Indeed, according to CDC officials, COVID-19 is rapidly becoming a "pandemic of the unvaccinated."  Emily Anthes & Alexandra E. Petri, *CDC Director Warns of a 'Pandemic of the Unvaccinated*,*'* N.Y. TIMES, (Jul. 22, 2021), https://www.nytimes.com/2021/07/16/health/covid-delta-cdc-walensky.html.

Nevertheless, even vaccinated individuals are not entirely immune from this evolving threat.  *See* Mandavilli*, supra*. (reporting that so-called "breakthrough infections" of COVID-19 in vaccinated Americans, though uncommon, are rising "with the arrival of the Delta variant").  One recent study found that breakthrough infections can put the vaccinated at risk of so-called "long-COVID" symptoms for at least six weeks, such as "headaches, muscle pain, loss of taste and smell and fatigue."  Rob Stein, *COVID Symptoms May Linger in Some Vaccinated People Who Get Infected, Study Finds*, NPR, (Jul. 28, 2021), https://www.npr.org/sections/health-

---

[6] Recently, given the virulence of the Delta variant, the percentage of those who are vaccinated has increased.

shots/2021/07/28/1021888033/breakthrough-infections-may-cause-long-covid-symptoms-small-study-suggests.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Under its plan, prisoners at heightened risk received priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Clare Hymes, *Federal Prisons to Prioritize Staffers for COVID-19 Vaccine and Give to Inmates When More Doses are Available*, CBS NEWS, (Dec. 16, 2020), https://www.cbsnews.com/news/covid-vaccine-federal-prisons-staffers/.

As of August 16, 2021, the BOP housed 130,836 federal inmates and employed approximately 36,000 staff. And, by that date, the BOP had administered 210,636 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed August 16, 2021).

Moreover, as of August 16, 2021, the BOP reported that 400 inmates out of a total of 130,836 inmates, and 289 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,848 inmates and 7,113 staff have recovered from the virus; and 238 inmates and four staff members have died from the virus. And, the BOP has completed 119,606 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Williamsburg, where the defendant is imprisoned, the BOP reported that as of August 16, 2021, out of a total of 1,538 inmates, none have tested positive. But, one staff members has tested positive for COVID-19, and 193 inmates and 70 staff have recovered at the facility. In addition, 156 staff members and 962 inmates at the Williamsburg complex have

17

been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Williamsburg*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/wil/ (last visited August 16, 2021).

## IV. Discussion

Kearney has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 840 at 2-4. Specifically, he asserts that he suffers from "diabetes, heart disease, strokes, respiratory infections, cerebrovascular, and morbid obesity," as well as hypertension and high cholesterol. *Id.* at 2.

The government concedes that at least one of defendant's listed afflictions, hypertension, presents a "risk factor" that could satisfy the "extraordinary and compelling" prong of the § 3582 analysis. ECF 952 at 16-17. But, the government contends that such a "circumstance now does not exist in this case" because, on April 13, 2021, defendant declined to receive a COVID-19 vaccine, as evidenced by BOP records. *Id.* at 18-19; ECF 952-3 at 215.

The reasons for defendant's decision are not clear. The government indicates only that defendant decided to forego the "self-care" that the BOP made available to him. *See* ECF 952 at 20. Further, the government asserts, and defendant has not disputed, that defendant "has no known countra-indication for the vaccine." *Id.* at 18. Accordingly, in the government's view, "notwithstanding the risk factor[s] he present[s], [defendant] does not present any extraordinary and compelling reason allowing compassionate release." *Id.* at 20.

The government's position is well supported. The CDC describes the COVID-19 vaccines as "safe and effective" and encourages all eligible persons to obtain one. *Key Things to Know about COVID-19 Vaccines*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated Aug. 11,

2021).  Changing circumstances in recent weeks have only underscored the imperative nature of this guidance.  Indeed, the CDC has confirmed that "the vaccines authorized in the United States are highly effective at preventing severe disease and death, including against the Delta variant." *Delta Variant: What We Know About the Science*, *supra*.

Moreover, a growing number of district court judges across the country, including some in the District of Maryland, have reasoned that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.  As Judge Gallagher recently observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months."  *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Church*, ELH-17-322, 2021 WL 2550506, at *9 (D. Md. June 21, 2021); *see also United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–*4 (D.D.C. May 24, 2021) (reasoning similarly, and noting that the defendant had "the advantage of being represented—and informed of the benefits of vaccination—by counsel," and that by exercising his right to refuse vaccination, the defendant "endanger[ed] himself and those around him"); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021) (noting that the defendant did not have any "medical contraindications for vaccination"); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United*

*States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Austin*, 15-20609, 2021 WL 1137987, *2 (E.D. Mich. Mar. 25, 2021); *United States v. Jackson,* CR-07-40-2, 2021 WL 1145903, at *2 (E.D. Pa. Mar. 25, 2021); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. White,* 15-CR-20040-01, 2021 WL 964050, at *2 (E.D. Mich. Mar. 15, 2021); *United States v. Reynoso*, __F.Supp.3d__, 2021 WL 950081, at *2 (D. Mass. 2021); *United States v. Jackson*, 15-CR-260(7) (PAM/TNL), 2021 WL 806366, at *1-*2, (D. Minn. Mar. 3, 2021); *United States v. Lohmeier*, 12-CR-1005, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021); *United States v. Williams*, CR-17-01279-001-PHX-DLR, 2021 WL 321904, at *3 (D. Ariz. Feb. 1, 2021); *United States v. Gonzalez Zambrano,* 18-CR-2002-CJW-MAR, 2021 WL 248592, at *5 (N.D. Iowa Jan. 25, 2021).

In light of what appears to be a consensus among judges on this issue, coupled with Kearney's failure to provide an explanation for his refusal of a vaccine, I conclude that his medical conditions do not constitute extraordinary and compelling circumstances under 18 U.S.C. § 3582.

Therefore, I need not address whether Kearney poses a danger to the community or the factors set forth in 18 U.S.C. § 3553(a).

## V.  Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 840), without prejudice to defendant's right to resubmit his request upon complete vaccination. However, this should not be construed as an indication of how the Court will rule on a renewed motion.

An Order follows, consistent with this Memorandum Opinion.

Date: August 30, 2021                                            _____/s/_____

                                                                                        Ellen L. Hollander
                                                                                        United States District Judge

21