## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

Criminal No.: ELH-18-17

ALBERT KEARNEY

Defendant.

### MEMORANDUM OPINION

This Memorandum Opinion concerns a second motion for compassionate release filed by defendant Albert Kearney, pursuant to 18 U.S.C. § 3582(c)(1)(A).  ECF 1042 (the "Motion").  Kearney, who is self-represented, is serving a 132-month sentence at Coleman I USP for the offense of conspiracy to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 and § 841(b)(1)(A).  ECF 419 (Judgment).

By Memorandum Opinion (ECF 973) and Order (ECF 974) of August 31, 2021, the Court considered and denied defendant's earlier request for compassionate release.  ECF 840 (the "First Motion").  In particular, upon considering defendant's "failure to provide an explanation for his refusal of a vaccine, I conclude[d] that his medical conditions do not constitute extraordinary and compelling circumstances under 18 U.S.C. § 3582."  ECF 973 at 20.  However, the First Motion was denied "without prejudice to [defendant's] right to resubmit his request following full vaccination for COVID-19."  ECF 974 at 1.

Kearney received a COVID-19 vaccination on December 6, 2021.  ECF 1042-1 at 1.[1]  In his Motion, he "asks this Court to reduce his term of imprisonment to time served and that he

---

[1] The vaccine was manufactured by Johnson & Johnson, for which only one dose was required.

immediately be placed on supervised release with the condition that he be placed on home confinement as the Court deems appropriate." ECF 1042 at 11-12. The government opposes the Motion (ECF 1061, the "Opposition"), supported by an exhibit of defendant's medical records. ECF 1061-1. Kearney has replied. ECF 1108 (the "Reply").

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion, in part. I shall reduce defendant's sentence from 132 months to 120 months of incarceration.

## I.      Background[2]

Kearney was indicted on January 11, 2018 (ECF 1), along with seventeen others. A Superseding Indictment was filed on March 22, 2018, which added a nineteenth defendant. ECF 157. In particular, defendant was charged in Count One with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846. *Id.* at 2. He was charged in Count Two with possession of a firearm by a prohibited person, under 18 U.S.C. § 922(g). *Id.* at 3. In Count Three, defendant was charged with possession with intent to distribute heroin, under 21 U.S. C. § 841(a). ECF 157 at 4. Count Four charged Kearney with possession of a firearm in furtherance of a drug trafficking crime, pursuant to 18 U.S.C. § 924(c). *Id.* at 5.

On December 10, 2018, defendant tendered a plea of guilty to Count One of the Superseding Indictment (ECF 347), pursuant to a Plea Agreement. ECF 349. The plea was entered under Fed. R. Crim. P. 11(c)(1)(C). *Id.* ¶ 9. Under the terms of the "C Plea," the parties agreed to a sentence in the range of 120 to 180 months of incarceration. *Id.*

---

[2] Where appropriate, I have drawn on the factual background of this case, as recounted in my Memorandum Opinion of August 31, 2021. ECF 973 at 1-4.

The Plea Agreement also included a Stipulation of Facts.  ECF 349 at 9.  According to the Stipulation, between March 2017 and January 2018, defendant was a member of the "'Good Pussy' heroin shop" ("GP heroin shop"), which operated around "the 5100 block of Fairlawn Avenue in Baltimore, Maryland," an area known as "the Buses."  *Id.*  Kearney participated in a conspiracy to obtain and distribute one kilogram or more of heroin.  *Id.*

Pursuant to an authorized wiretap, the Drug Enforcement Administration intercepted wire and electronic communications between members of the GP heroin shop, including Kearney, discussing the conspiracy's operations.  *Id.*  Pole cameras were positioned near the Buses and at 4201 Penhurst Avenue, where the conspirators kept their supply of heroin.  *Id.*  Using these cameras, investigators captured video evidence of defendant, on numerous occasions, "going to the location of the GP heroin shop's stash location," before "driving directly to the Buses to supply heroin" to his co-conspirators.  *Id.*

In March 2017, investigators executed a search warrant of defendant's residence.  *Id.*  They recovered 101 grams of heroin, a loaded firearm, and over $1,100.  *Id.*  After defendant was advised of his *Miranda* rights, he admitted that the property belonged to him.  *Id.*

In the Plea Agreement, the parties contemplated a base offense level of 30, based on the drug quantity, pursuant to § 2D1.1(c)(5) of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  *Id.* ¶ 6(a).  The parties also agreed to a two-level increase under U.S.S.G. § 2D1.1(b)(1), because the defendant possessed a firearm during the commission of the offense.  *Id.*  There was no agreement as to defendant's criminal history.  *Id.* ¶ 7.  But, the Plea Agreement reflects the government's belief that defendant would qualify as a career offender under U.S.S.G. § 4B1.1(a), which would increase his base offense level to 37, before deductions for acceptance of responsibility.  *Id.* ¶ 6(a).

The Presentence Investigation Report (ECF 408, the "PSR") reflected that the defendant, born in 1968 (*id.* at 3), has a long criminal history. *Id.* ¶¶ 28-45. This resulted in his designation as a career offender. *Id.* ¶ 47.

Several of the offenses listed in the PSR did not score points. *See Id.* ¶¶ 28-38, 42, 43, 45. However, of pertinence here, defendant's record included two prior felony drug distribution convictions. *Id.* ¶¶ 39, 40. In December 2001, Kearney was convicted of distribution of a controlled dangerous substance as well as conspiracy. *Id.* ¶ 39. He received concurrent sentences of twenty years imprisonment, of which sixteen years, eight months, and five days were suspended, as well as five years' probation. *Id.* Nearly six years later, in September 2007, defendant pled guilty to distribution of narcotics, for which he was sentenced to ten years' incarceration, of which nine years, eight months, and one day were suspended, and three years' probation. *Id.* ¶ 40. In other words, it appears to have been a time served sentence.

Sentencing in this case was held on February 22, 2019. ECF 435. At the time, Kearney was fifty years old. *See* ECF 408 at 3. He had a history of physical and mental ailments. *Id.* ¶¶ 77-82. He also reported a history of use of marijuana, alcohol, heroin, and crack cocaine, including daily use of all four substances for various periods of time. *Id.* ¶ 84. And, he previously participated in substance abuse treatment programs, with little or no success. *Id.* ¶ 86. Nonetheless, Kearney indicated that he would be "amenable to participating in substance abuse treatment while in the Bureau of Prisons and as a condition of his supervision." *Id.*

Based on a career offender designation (*id.* ¶¶ 21, 47), Kearney had an offense level of 37 and a criminal history category of VI. *Id.* After deductions for acceptance of responsibility, he had a final offense level of 34. *Id.* ¶ 24.

As of the time of sentencing, the defendant had never served a lengthy sentence.  *See* ECF 408.  However, the offense of conviction carried a mandatory minimum term of ten years' imprisonment, with a maximum of life imprisonment.  ECF 408, ¶ 97; ECF 349, ¶ 3.  Based on an offense level of 34 and a criminal history category of VI, the Guidelines called for a period of imprisonment ranging from 262 to 327 months.  ECF 408, ¶ 98.  And, as noted, under the C Plea, the parties agreed to a sentence ranging from 120 to 180 months of imprisonment.

Notably, if defendant were not a career offender, his criminal history category would have been a IV, rather than a VI.  *Id.* ¶ 46.  And, his final offense level would have been a 29, rather than a 34.  *See id.* ¶ 20.  In that circumstance, the Guidelines would have called for a sentence of imprisonment ranging from 121 to 151 months.  As discussed, *infra*, if defendant were sentenced today, he would not qualify as a career offender.

The Court has not been provided with a sentencing transcript.  But, according to the notes in my Chambers file, the government recommended a sentence of 144 months (12 years) of incarceration.  The Court imposed a sentence of 132 months' imprisonment (11 years), with credit for time served, followed by five years of supervised release.  ECF 419.

On September 9, 2020, defendant submitted a request for compassionate release to the Warden.  ECF 840-2 at 7.  That request was promptly denied.  *Id.* at 8.  Defendant sought an administrative remedy, asking the Warden to conduct a review of defendant's medical history, pursuant to his request for compassionate release.  *Id.* at 6.  This request was also denied.  *Id.* at 6.  Thereafter, on December 9, 2020, defendant submitted his First Motion for compassionate release.  ECF 840.  As mentioned, by Memorandum Opinion (ECF 973) and Order (ECF 974) of August 31, 2021, I denied that motion, "without prejudice to [Kearney's] right to resubmit his request following full vaccination for COVID-19."  ECF 974 at 1.

As noted, Kearney received a COVID-19 vaccination on December 6, 2021 (ECF 1042-1 at 1), and filed the Motion on March 3, 2022.  ECF 1042.  In support, he observes that he "has a startling four of the core risk factors identified by the CDC for particular susceptibility to COVID-19, diabetes, stroke, heart disease and morbid obesity."  ECF 1042 at 10.  Kearney also states that he has "family support from his sister, Robin James, whom he plans to live with upon release, as well as his mother, Christine James . . . ."  *Id.* at 11.

The government contends that "although Petitioner's medical condition confers threshold eligibility, he has not established extraordinary and compelling reasons for compassionate release because he is not exposed to any risk of severe infection from a BOP facility."  ECF 1061 at 16.  And, the government argues that "[t]he factors set forth in 18 U.S.C. § 3553(a) further support a denial of the requested relief."  ECF 1061 at 28.  The government does not contest that defendant has exhausted his administrative remedies.

Kearney is currently serving his sentence at Coleman I USP.[3]  ECF 1042 at 1.  Defendant has a projected release date of June 14, 2028.  *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Mar. 31, 2023).  To date, Kearny has served approximately 53% of his sentence.

Additional facts are discussed, *infra*.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir.

---

[3] Defendant began his sentence in Fort Dix FCI.  He was transferred to Williamsburg FCI on July 30, 2020. ECF 952-3 at 151.

2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)).  *Malone*, 57 F.4th at 173.  Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194.  This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66

(2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383. And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria. *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criteria is met,

the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[4]  In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application

---

[4] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A).  *See, e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276.  Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA.  It is *only* "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release."  *McCoy*, 981 F.3d at 276.  And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful

guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6.  The Court explained that the "Guidelines range 'anchor[s]'

the sentencing proceeding . . . .  The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, ___ F.4th ___, 2023 WL 2669649, at *2 (4th Cir. Mar. 29, 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy*, 2023 WL 2669649, at *3; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2.  However, such changes do not warrant a recalculation of the Guidelines.  *Troy*, 2023 WL 2669649, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling

reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

Of relevance, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3. That said, "[h]ow much explanation is 'enough' depends on the complexity of a given

case." *United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *3 (4th Cir. Jan. 18, 2023); *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.  Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

14

### III. COVID-19[5]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.
COVID deaths after losing political battles*, REUTERS (May 12, 2022),
https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.
And, as of March 10, 2023, COVID-19 has infected more than 103.8 million Americans.  *See
COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Mar.
24, 2023).

The judges of this Court "have written extensively about the pandemic."  *United States v.
Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).
Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the
pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described
as the worst public health crisis that the world has experienced since 1918.  *See United States v.
Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents
a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some
time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart
the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19),
How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022),
https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the
pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as
we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich.
May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified
certain risk factors that may increase the chance of severe illness due to the coronavirus, and the

CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 22, 2023), https://www.cdc.gov/aging/covid19/index.html.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk

category." *Id.* at 196.  Nevertheless, the court may consider the CDC's guidelines.  *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19."  *Bethea*, 54 F.4th at 832.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (JANUARY 26, 2023), https://bit.ly/3dPA8Ba (last accessed Mar. 31, 2023).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance

themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney

---

[7] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. Times (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. Times (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. Times (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at \*9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of March 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Mar. 23, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Mar. 23, 2023); Moreover, approximately 54.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 5 and older. *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Mar. 2, 2023).

Federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999. Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older. *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. Much has changed since that time.

As of March 24, 2023, the BOP had 145,288 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 349,229 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last updated Mar. 24, 2023).

**D.**

The number of COVID-19 cases continues to fluctuate. For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/. But, the variant then seemed to subside. *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Mar. 24, 2022).

At this point, COVID-19 has, in a sense, become a fact of life. *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021, https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future."). In other words, we are in "a more endemic phase of this crisis . . . ." *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022). Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States. Alexander Tin, *Biden says Covid-19 pandemic is "over"*

*in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over." *Id.*

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, effective May 11, 2023.  *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).   And, Congress has passed a joint resolution (H.J. Res. 7) seeking to end the national emergency, perhaps earlier than May 11, 2023.  *Id.*

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05.  And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*  Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of March 24, 2023, 191 federal inmates, out of a total population of 145,288, and 47 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 45,031 inmates and 15,219 staff have recovered from the COVID-19 virus.  In addition, 314 inmates and seven staff members have died from the virus.  The BOP has completed 128,642 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Coleman I USP, where the defendant is imprisoned, the BOP reported that as of March 24, 2023, out of a total of 1,408 inmates, zero inmates and zero staff members currently test positive, one inmate and zero staff members have died of COVID-19, and 124 inmates and 154 staff have recovered at the facility.  In addition, 757 staff members and 5,481 inmates across the Coleman facilities inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/;                    BUREAU                OF              PRISONS,

26

https://www.bop.gov/locations/institutions/mck/ (last accessed Mar. 31, 2023).[8]

## IV.  Discussion

### A.

Kearney has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19.  ECF 1042 at 1-3.  Specifically, he notes that he "has a startling four of the core risk factors identified by the CDC for particular susceptibility to COVID-19[:] diabetes, stroke, heart disease and morbid obesity."  ECF 1042 at 10.

Kearney's medical records indicate that he is 54 years old and suffers from heart disease/hypertension, cerebrovascular disease/stroke, obesity, and prediabetes.  *See* ECF 1061-1 at 203, 281, 338.  The CDC is clear that hypertension and heart disease can render an individual more likely to get very sick from COVID-19.  *People with Certain Medical Conditions*, *supra*. Kearney's medical records indicate that he had a stroke in 2020.  *Id*. at 281.  And, "[h]aving cerebrovascular disease, such as having a stroke which affects blood flow to the brain," can also make an individual mor likely to get very sick from COVID-19.  *People with Certain Medical Conditions*, *supra*.  Additionally, Kearney's records show that he has a body mass index ("BMI") of 37, which qualifies him as obese under the CDC guidelines.

Some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g*., *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021)

---

[8] Vaccination data is not available for Coleman I USP.  Rather, data is available for the total inoculations in Coleman I USP, Coleman II USP, Coleman Low FCI, and Coleman Medium FCI.

("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *Williams*, 2020 WL 3073320, at *1 (finding defendant with a BMI of 32.5 was obese and qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*. Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions such as those affecting Kearney. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia,

hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (finding defendant's hypertension and diabetes qualified as extraordinary and compelling reason). There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

The government contends that while "Petitioner's medical condition confers threshold eligibility" (ECF 1061 at 16), Kearney "no longer presents an 'extraordinary and compelling reason' because he has declined vaccination." *Id.* at 18. However, as noted, Kearney received the Johnson COVID-19 vaccination on December 6, 2021. ECF 1042-1 at 1. Therefore, the contention is moot.

It is without question that the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus.  But, they are not entirely effective, particularly as to the latest variants.  "The variants have shown a remarkable ability to get around the protection offered by infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, BALT. SUN (July 14, 2022).

As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."  Therefore, the fact of vaccination or prior infection does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release.  Accordingly, the fact that Kearney has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

As illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable.  In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CENTERS FOR DISEASE CONTROL, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Mar. 31, 2023).  Indeed, an analysis of "nationwide data from the Centers for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."  Fenit Nirappil

& Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, WASH. POST (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 5 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series. *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL, https://bit.ly/3MdQMM6 (last updated Mar. 2, 2023). And, the parties have not presented the Court with any evidence regarding whether defendant was offered a booster, received a booster, or declined a booster.

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status. *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

"At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021). In light of the evolving circumstances regarding COVID-19, coupled with defendant's medical issues, I conclude that Kearney's vaccination status does not render him ineligible for compassionate release. *See*

*Palmer*, 2021 WL 3212586, at *3 (noting that it is not possible "to predict the impact of the vaccines on future strains of the virus . . . ."). To the contrary, I conclude that defendant's multiple health conditions render him eligible for compassionate release. *See United States v. Carter*, CCB-16-235, 2021 WL 3725425, at *2 (D. Md. Aug. 20, 2021) (granting compassionate release to a vaccinated defendant who was obese and suffered from hypertension and Hodgkin Lymphoma); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances). That determination does not end the inquiry, however.

**B.**

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186. The Court must also consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community. U.S.S.G. § 1B1.13(2).

The government argues that Kearney is a danger to the community, citing, *inter alia*, the seriousness of his offense and his prior criminal history. ECF 1061 at 29-30. There is no doubt that defendant's crime was a serious one. As the government notes, Kearney played an integral role in an extensive drug organization that involved a large quantity of heroin. *Id.* at 29. Furthermore, Kearney has a significant criminal history, resulting in his designation as a career offender. Therefore, a lengthy sentence of incarceration was, and remains, appropriate.

However, the legal landscape has changed since defendant's sentencing in February 2019. ECF 435. About six months later, in August 2019, the Fourth Circuit decided *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019). In *Norman*, the Court concluded that a federal drug conspiracy offense is not a qualifying career offender offense under U.S.S.G. § 4B1.2(b). *Id.* at 237-39. This means that defendant's offense of conviction – conspiracy to distribute heroin – would not qualify him for the career offender designation. Nevertheless, this determination would not have changed defendant's mandatory minimum sentence of ten years.

The parties do not address *Norman*. But, I recognize that *Norman* is not retroactive. And, as *Troy* makes clear, 2023 WL 2669649, at *3, it does not alter the defendant's Guidelines calculation. But, the Court certainly may, in its discretion, consider changes in the legal landscape when deciding whether or not to reduce the defendant's sentence. *Concepcion*, 142 S. Ct. at 2396.

Here, because defendant is not a career offender, his Guidelines would have called for a sentence of imprisonment ranging between 121 to 151 months. The Court's sentence of 132 months fell within the Guidelines that would have applied, even without the career offender designation. The sentence also fell within the C plea range of 120 to 180 months. But, the Court cannot rule out that the career offender designation impacted the government's recommendation and the Court's determination to impose a sentence of 132 months.

Kearney's prior convictions did not involve violence, although the Court is aware that the drug trade itself often involves violence.  And, despite Kearney's lengthy prior record, he has already been incarcerated longer than any of his prior periods of imprisonment.  *See* ECF 408, ¶¶ 28-45.  Furthermore, there is no indication that defendant has committed any disciplinary infractions while incarcerated.  Moreover, it is undisputed that Kearney has successfully completed several BOP programs during his term of imprisonment.  ECF 840-2 at 2.

Kearney's behavior while in BOP custody is an important indicator of whether he remains a danger to the community.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'"  *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).  Thus, Kearney's post-sentencing conduct weighs in his favor.

In addition, I am mindful that defendant's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction*."  United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5, 456 F. Supp. 3d 557 (S.D.N.Y. Apr.

24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Accordingly, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in this Circuit and elsewhere have granted sentence reductions without immediate release.  *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

As I see it, the period of incarceration that Kearney has served to date is not sufficient to warrant his immediate release.  His lengthy prior record, and repeated violations of probation, are of concern to the Court.  And, this was a serious case, for which punishment is warranted.

However, in light of defendant's various medical conditions, his conduct while incarcerated, and his erroneous designation as a career offender, I am of the view that a reduction of Kearney's sentence is appropriate.  I conclude that a sentence of 120 months is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  *See* 18 U.S.C. § 3553(a).  This sentence corresponds to the bottom of the C Plea range, as well as the mandatory minimum.[9]

### V.  Conclusion

For the reasons set forth above, I shall grant the Motion (ECF 1042), in part.  Kearney's sentence shall be reduced from 132 months to 120 months of imprisonment.  The terms and conditions of supervised release to which Kearney was originally sentenced will remain in place. An Order follows, consistent with this Memorandum Opinion.

Date: April 5, 2023

_____/s/_____

Ellen L. Hollander
United States District Judge

---

[9] The Court recognizes that it is not bound by the mandatory minimum at this juncture. But, I reference it because it speaks to the seriousness of the offense, at least in the view of Congress.